EL VOCERO DE PUERTO RICO, demandante, *v.* HON. NICOLÁS NOGUERAS, demandado.

*Número:* MD-95-4          *Resuelto:* 16 de marzo de 1995

*Juan R. Marchand Quintero, Francisco Ortiz Santini*, de *Rivera Cestero & Marchand Quintero*, abogados del peticionario; *Miguel Pagán*, de *Ortiz Ballester & Pagán*, abogado del demandado; *Carmen I. Amy* y *Olyvette Rodríguez*, de la *Oficina de Ética Gubernamental*.

## SENTENCIA

*El Vocero de Puerto Rico* (en adelante *El Vocero*) solicitó de este Tribunal que ordenara al Senador Nicolás Nogueras a proveerle el informe financiero de 1993, según lo requiere el Art. 4.4 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1834. El peticionario invocó la jurisdicción original de este Tribunal al amparo del Art. 649 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3421, que nos concede la facultad de expedir un auto de *mandamus* para requerir de una persona el cumplimiento de un acto dentro de sus deberes.

A los fines de evaluar el recurso, concedimos término al Director de la Oficina de Ética Gubernamental para exponer su posición sobre la petición de *El Vocero*. El Director compareció ante nos e informó que el Senador Nogueras había presentado tardíamente su informe a la Oficina de Ética Gubernamental y que la Comisión de Ética del Senado había suministrado copia del mismo a la prensa del país. Además señaló que, una vez el Senador Nogueras sometió el informe financiero de 1993, el recurso de *El Vocero* se convirtió en académico.

Luego de haber sido informado por el Director de la Oficina de Ética Gubernamental que el Senador Nogueras presentó el informe financiero de 1993, *se dicta sentencia y se deniega el auto de mandamus solicitado por El Vocero porque la petición es académica.*

Lo acordó el Tribunal y certifica la señora Subsecretaria General. El Juez Asociado Señor Hernández Denton emitió una opinión de conformidad, a la que se unieron los Jueces Asociados Señor Alonso Alonso y Señor Fuster Berlingeri. El Juez Asociado Señor Alonso Alonso emitió una opinión de conformidad. El Juez Asociado Señor Rebollo López emitió una opinión concurrente y disidente. El Juez Asociado Señor Negrón García emitió una opinión disidente. La Juez Asociada Señora Naveira de Rodón no intervino.

(*Fdo.*) Carmen E. Cruz Rivera
*Subsecretaria General*

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton, a la cual se unen los Jueces Asociados Señor Alonso Alonso y Señor Fuster Berlingeri.

I

Mediante recurso de *mandamus, El Vocero de Puerto Rico* (en adelante *El Vocero*) nos solicita que ordenemos al Senador Nicolás Nogueras a suministrarle "al peticionario la información financiera relacionada en el artículo 4.4 de la Ley de Ética incluyendo, *inter alia,* sus ingresos, las fuentes de los mismos, etcétera, tal y como debió en su día suministrarse a la [Oficina de Ética Gubernamental]". (Énfasis en el original.) Petición de auto de *mandamus,* pág. 10. En su recurso, *El Vocero* sostiene que, en lugar de someter el informe financiero requerido por ley para 1993, el

Senador Nicolás Nogueras presentó ante la Oficina de Ética Gubernamental "un estado de situación que muestra activos y pasivos, pero no ingresos ni las fuentes de los mismos". Íd., pág. 6.

Por su parte, el Senador Nicolás Nogueras compareció ante este Tribunal y sostuvo que el asunto objeto del recurso está ante la consideración de la Comisión de Ética del Senado y que constituiría una violación de la separación de poderes requerirle que entregue al peticionario unos documentos sobre una querella que está siendo investigada por dicha comisión.

A los fines de evaluar el recurso, se le concedió término al Director Ejecutivo de la Oficina de Ética Gubernamental (en adelante el Director) para exponer su posición sobre la petición juramentada por *El Vocero*. Oportunamente, el Director compareció y nos informa que "el 27 de febrero de 1995 el senador Nicolás Nogueras presentó tardíamente ante la [Oficina de Ética Gubernamental] su informe financiero de 1993, según la obligación impuesta por la Ley de Etica Gubernamental ...". (Escolio omitido.) Moción en cumplimiento de resolución, pág. 3. Además, expone que la Comisión de Ética del Senado "puso a la disposición de la prensa del País" copia del informe financiero. Íd. Finalmente, en su escrito el Director sostiene que la petición de *El Vocero* se ha tornado académica porque el Senador Nicolás Nogueras cumplió con su deber ministerial al rendir el informe requerido por ley.

Después de examinar la comparecencia del Director, el Tribunal deniega la petición de *El Vocero* por entender que el recurso se tornó académico. Coincidimos con este criterio. No obstante, aprovechamos la ocasión para explicar por qué entendemos que el recurso es académico y para expresarnos sobre las obligaciones que tienen todos los legisladores de rendir anualmente un informe financiero.

## II

El Art. 4.1 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, Ley Núm. 12 de 24 de julio de 1985 (3 L.P.R.A. sec. 1831), le impone a ciertos funcionarios y empleados públicos el deber de rendir anualmente un informe financiero a la Oficina de Ética Gubernamental. Entre los funcionarios expresamente incluidos se encuentran los "miembros de la Asamblea Legislativa ...". Íd.

Por su parte, el Art. 4.2(b) de la mencionada ley, 3 L.P.R.A. sec. 1832(b), dispone que mientras el funcionario permanezca en su cargo deberá someter estos informes todos los años no más tarde del 1ro de mayo. Si el funcionario cesa en su cargo deberá someter un informe financiero en o antes de sesenta (60) días después de concluir sus funciones.

Por otro lado, a tenor con su poder constitucional de aprobar reglas de procedimiento y de gobierno interno, y mediante lo dispuesto en el inciso (j) del Art. 2.4 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1814(j), el Senado aprobó el Código de Ética y el Reglamento sobre Radicación de Informes Financieros por los Senadores, Funcionarios y Empleados del Senado de Puerto Rico (en adelante Reglamento sobre Radicación de Informes Financieros) mediante la R. del S. 131 de 6 de marzo de 1993. El Art. 4 de este Reglamento reitera la obligación de todo Senador de someter informes financieros anualmente a la Oficina de Ética Gubernamental al disponer que "[d]eberá someter informes financieros todo Senador, funcionario y empleado, según definido en este Reglamento".

Del texto de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, así como del Código de Ética del Senado y del Reglamento sobre Radicación de Informes Financieros, se desprende claramente que esta

obligación de someter informes anuales, con la información requerida por dicho reglamento, les impone tanto a los Senadores como a los empleados cobijados por el estatuto un deber ministerial que surge por razón del cargo público que éstos ocupan y que no está sujeto a su discreción. Así lo reconoce el Director en su comparecencia ante nos:

> No cabe la menor duda de que el acto para el cual se reclama su cumplimiento mediante este auto de mandamus es uno que constituye un deber ministerial. Todos los miembros de la Asamblea Legislativa tienen la obligación o el deber ministerial de presentar, de conformidad con los términos establecidos en la Ley de Etica Gubernamental, los informes financieros que ésta requiere. Así lo dispone el Artículo 4.1(A)(6) de la Ley de Etica Gubernamental.
> Si bien consideramos que no toda obligación legal constituye un deber ministerial, en el caso que nos ocupa estamos ante una que sí lo es. Rendir los informes financieros es una obligación legal que surge por razón del cargo público y la cual no admite discreción en su ejecución. Moción en cumplimiento de resolución, pág. 2.

El historial legislativo de dicha ley también confirma que la intención de la misma fue imponerle a los legisladores esta obligación ministerial, cuyo incumplimiento constituye un delito grave que, de probarse, impediría que un Senador pueda postularse nuevamente para el cargo:

> SR. IZQUIERDO STELLA: Sí, son como siete (7) preguntas en una, pero le voy a contestar en una forma resumida. Definitivamente en cuanto a la obligación ministerial que tiene el Legislador de radicar el informe financiero en la Oficina de Etica Gubernamental, si viola alguna de las indicaciones que tiene que cumplir con ella, como cualquier funcionario público, estaría incurriendo sin lugar a dudas, en un delito.
> SR. RAMOS, ORESTE: Claro, que en este caso, por la pena, pues lo incapacitaría para ocupar una posición de elección posterior, de acuerdo con las disposiciones del Código Político. Ahora...
> SR. IZQUIERDO STELLA: Las disposiciones del Código Político, son a los efectos que si es un delito grave ....
> SR. RAMOS, ORESTE: Grave.
> SR. IZQUIERDO STELLA: ...que una persona que es convicto de delito grave, no puede correr para ninguna posición electiva.

SR. RAMOS, ORESTE: Correcto, pero grave ....

SR. IZQUIERDO STELLA: Si a esos efectos, si no fuera convicto ....

PRES. ACC. (SR. PEÑA PEÑA): La Presidencia quiere señalar al compañero Oreste Ramos, senador Oreste Ramos, que le quedan minuto y medio.

SR. RAMOS, ORESTE: Sí. Entonces a la disposición civil, el Secretario de Justicia, independientemente de que haya o no intención criminal, puesto que en ese caso es simplemente si se realizó la transacción, con o sin intención, si se realizó la transacción y no se informó, puede el Secretario de Justicia radicar entonces un pleito y obligar a la persona a pagarle al erario tres (3) veces el monto de la transacción no informada, como lo dispone ....

SR. IZQUIERDO STELLA: Después que se encontrara que ha violado, yo entiendo que el Secretario de Justicia podría instar esa acción civil.

SR. RAMOS, ORESTE: Pero se requeriría intención ahí o bastaría con la preponderancia de la prueba o bastaría con acreditar simplemente que no informó. Diario de Sesiones del Debate Sust. al P. del S. 292 de 29 de mayo de 1985, pág. 4826.

De lo anterior también se desprende que, de determinarse que el legislador violó una de las disposiciones del estatuto, el Secretario de Justicia está expresamente facultado para no solamente encausarlo criminalmente, sino también, incoar las acciones civiles descritas en el Art. 4.11 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1841.

Aunque la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico dispone un procedimiento sobre la radicación e investigación de los informes rendidos por los funcionarios públicos, en el caso particular de los legisladores, el Art. 4.10(d) de la citada ley, 3 L.P.R.A. sec. 1840(d), estableció un procedimiento distinto para evaluar sus informes financieros. El estatuto dispone que una vez se recibe el informe, entonces el Director procede a evaluar si la información incluida está completa. Una vez verifica que la información está completa, el Director "determinará que el informe es final para que se considere como un *documento público*". Íd. De lo anterior resulta claro que el

estatuto expresamente dispone que los informes de los legisladores son de carácter público una vez se someten a la Oficina de Ética Gubernamental. Concluida esta etapa, el Director tiene que analizar la información incluida para determinar si el legislador incurrió en alguna violación de las normas y prohibiciones del estatuto. Si el Director concluye que existe "la posibilidad de que un funcionario o empleado de la Rama Legislativa haya violado las disposiciones de este capítulo remitirá el informe financiero a la comisión correspondiente para que se tomen las acciones que correspondan". Íd.

Por otro lado, si el legislador no somete el estado financiero con la información requerida por la ley y el reglamento aplicables, el Director puede recurrir a la Cámara correspondiente para que se tomen las medidas que procedan en derecho. Sin embargo, el estatuto no impide que una persona o parte interesada solicite a un tribunal que expida un *mandamus* en el cual se le ordene al legislador cumplir con su deber ministerial de someter un informe financiero para el año correspondiente con toda la información requerida por la ley y el reglamento correspondiente. Así ocurrió el año pasado cuando *El Vocero* obtuvo del Tribunal Superior un auto de *mandamus* en el cual se le requería a los legisladores que rindieran informes financieros a la Oficina de Ética Gubernamental y remitieran copias al periódico. Véase *El Vocero de P.R. v. Hernández Agosto*, 133 D.P.R. 413 (1993).

En vista del deber impuesto por ley a los miembros de la Asamblea Legislativa, el *mandamus* es un recurso apropiado en casos como el de autos. Dicho recurso "es un auto altamente privilegiado dictado por el Tribunal Supremo del Estado Libre Asociado, o por el Tribunal Superior de Puerto Rico, a nombre del Estado Libre Asociado de Puerto Rico, y dirigido a alguna persona o personas naturales, a una corporación o a un tribunal judicial de inferior categoría, dentro de su jurisdicción requiriéndoles para el cum-

plimiento de algún acto que en dicho auto se exprese y que esté dentro de sus atribuciones y deberes". 32 L.P.R.A. sec. 3421. El mismo esencialmente está concebido para obligar a una persona o entidad pública a cumplir con una obligación impuesta por ley, cuando esa facultad no es discrecional. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994). Como el *mandamus* parte de la premisa de que tenemos un gobierno de leyes y no de hombres y que todos los funcionarios están obligados a cumplir y obedecer las leyes, el recurso provee un instrumento a una parte interesada para obligar al funcionario a cumplir con su deber ministerial. Véase D. Rivé Rivera, *El Mandamus en Puerto Rico*, 46 (Núms. 1–4) Rev. C. Abo. P.R. 15 (1985).

### III

En el caso particular del recurso ante nuestra consideración, el periódico *El Vocero* presentó una petición de mandamus contra el Senador Nicolás Nogueras para que se le ordenase rendir el Informe Financiero de 1993 con la información completa requerida por la Ley de Ética Gubernamental. De la comparecencia, tanto del peticionario como del Director, se desprende que el Senador Nogueras sometió tardíamente el informe de 1993 con información incompleta y el mismo fue devuelto por el Director.

Mientras se encontraba pendiente ante este Tribunal la Petición de *mandamus*, el Director nos comunicó que el Senador Nogueras "presentó tardíamente ante la OEG el informe financiero de 1993, según la obligación impuesta por la Ley de Etica Gubernamental, informe financiero que la Comisión de Etica del Senado puso a la disposición de la prensa del País ...". (Escolio omitido.) Moción en cumplimiento de resolución, pág. 6. Cumplido este trámite, el Director sostiene que la petición de *El Vocero* es académica porque el Senador Nogueras rindió el informe requerido y cumplió con su deber ministerial. Además, expone que el

informe está sometido en la Oficina de Ética Gubernamental para la evaluación e investigación correspondiente al amparo del trámite dispuesto en el Art. 4.10 del estatuto, 3 L.P.R.A. sec. 1840.

Posteriormente, en otra comparecencia en contestación a una réplica de *El Vocero*, el Director aclaró que cuando expuso en su escrito anterior que el Senador Nogueras presentó su informe de 1993, "según la obligación impuesta por la Ley de Etica Gubernamental", esto no se limitaba a consideraciones de forma, sino a que dicho informe estaba completo:

> En nuestra Moción en cumplimiento de Resolución le indicamos a este Honorable Tribunal que el informe financiero del senador Nicolás Nogueras, hijo, se presentó ante la Oficina de Etica Gubernamental, según la obligación impuesta por la Ley de Etica Gubernamental. *Sin que en forma alguna se considere que el informe financiero que nos ocupa ha sido evaluado conforme lo requiere la Ley de Etica Gubernamental y el Reglamento del Senado*, R. del S. 131 de 18 de marzo de 1993, traemos a la atención de este Honorable Tribunal que cuando la Oficina de Etica Gubernamental hace una aseveración como esa no se limita a consideraciones de forma. Hemos interpretado, de conformidad con la Ley, que se considera radicado aquel informe que complementado en todas sus partes ha sido presentado ante la Oficina de Etica Gubernamental bajo juramento, ya sea personalmente o por correo certificado. (Énfasis en el original.) Moción en relación a réplica parte demandante, pág. 2.

Enterados de que el Senador Nogueras ha cumplido con su deber ministerial de rendir un informe financiero para 1993, y en ausencia de algún señalamiento del Director de que el informe no cumple con los requisitos de ley, claramente el recurso ante nos ha perdido "su condición de controversia viva y presente, característica que siempre ha de existir si un tribunal quiere evitar opiniones consultivas en asuntos abstractos de derecho". *Noriega v. Hernández Colón*, supra.

Una vez el Senador Nogueras sometió el informe financiero de 1993 a la Oficina de Ética Gubernamental y el

Director determinó que estaba completo, el mismo, por disposición estaturaria, es un documento público y la información financiera jurada incluida está sujeta a inspección pública por parte del peticionario. Como *El Vocero* y todos los otros medios obtuvieron copia de dicho informe, el peticionario ya obtuvo la información que solicitó en el Recurso de *mandamus*. Por lo tanto, su petición original ante nosotros es totalmente académica.

En el caso particular de autos, aunque el asunto es de gran interés público, una vez el Director nos notifica que el Senador Nogueras cumplió con su deber ministerial, la prudencia judicial aconseja que este Tribunal se abstenga de hacer pronunciamientos adicionales. Recordemos que la función judicial, de ordinario, sólo debe ejercerse para resolver "controversias genuinas que surjan entre partes opuestas que tengan un interés real en obtener un remedio jurídico concreto que tenga un efecto práctico respecto a su disputa". *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927, 934–935 (1993). Véanse, además: *Alonso Hernández v. Citibank, N.A.*, 136 D.P.R. 569 (1994); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991).

Por las razones expuestas anteriormente, estamos conformes con la sentencia emitida por el Tribunal. De esta manera evitamos el uso innecesario de los recursos judiciales para adjudicar una controversia que se convirtió en académica.

Corresponde ahora en primera instancia al Director evaluar la información sometida por el Senador Nicolás Nogueras, hijo, en su informe financiero, y actuar de conformidad con lo dispuesto en la Ley de Ética Gubernamental y en la Resolución del Senado 131 de 18 de mayo de 1983. Luego de ello, *El Vocero* o cualquier otra parte interesada puede incoar la acción que corresponda en derecho para obtener cualquier otro remedio judicial que estime procedente.

## — O —

Opinión de conformidad emitida por el Juez Asociado Señor Alonso Alonso.

La posición del Juez Asociado Señor Negrón García no se entiende. Pretende que le ordenemos a la Oficina de Ética Gubernamental que le entregue a *El Vocero* un informe financiero que, como cuestión de hecho, *ya éste tiene en su poder.* Ello es un ejercicio en futilidad. Lo que ya se tiene no hay que darlo.

El periódico *El Nuevo Día* en su edición del miércoles 1ro de marzo de 1995 publicó y comentó el Informe Financiero de 1993 presentado por el Senador Nicolás Nogueras en la tarde del lunes en la Comisión de Ética del Senado.

Por otra parte, la posición del Juez Asociado Señor Rebollo López es un híbrido que tampoco se entiende. Por un lado *no reconoce* que ya *El Vocero* tiene el Informe Financiero en su poder, y que por ello el recurso es académico, y por otro asume la posición de que debemos desestimar el recurso porque el asunto planteado es una "cuestión política" y un asunto "no justiciable".

No logro entender el por qué de las opiniones de estos compañeros Jueces. Ambas son claramente consultivas y jurídicamente insostenibles. *La sentencia del Tribunal no lo es.*

Somos concientes de que la sociedad contemporánea está convulsionada por acontecimientos que socavan los valores y pilares en que se fundamenta la democracia y la razón de ser del Estado. La sociedad va perdiendo cada vez más credibilidad en sus instituciones. Esto le resta legitimidad a su razón de ser y pone en riesgo la legitimidad de sus actos.

*Hemos hecho lo que el ordenamiento jurídico nos permite hacer responsablemente en este momento. Ni más ni menos.*

Este Tribunal tiene la función de ser el custodio de

nuestra Constitución y de nuestro ordenamiento legal. Somos, además, los llamados a juzgar las violaciones a éstos y ser guardianes de los principios fundamentales de nuestro ordenamiento constitucional y jurídico, tales como: que la dignidad del ser humano es inviolable; que todos los hombres son iguales ante la ley; de la libertad de expresión y de prensa, y que la voluntad del pueblo es la fuente del poder público y donde el poder político está subordinado a los derechos del hombre, entre otros principios no menos importantes.

*Estas responsabilidades no son delegables; no las podemos evadir, y no pueden tomarse livianamente.*

Hay que descargarlas con fundamentos jurídicos sólidos; con valentía; con voluntad firme; con honestidad e integridad, y con sabiduría y prudencia.

*La sentencia que ha emitido el Tribunal responde a estos criterios.*

Además, como bien señala la Opinión de conformidad del Juez Asociado Señor Hernández Denton, a la cual me he unido, como ya se ha entregado el informe financiero a la Oficina de Ética Gubernamental y a *El Vocero*, lo que procede ahora es que en primera instancia el Director de dicha oficina *lo evalúe y actúe conforme a la ley y a la Resolución del Senado 131 de 18 de mayo de 1983.* Luego de ello *El Vocero o cualquier* otra parte interesada *puede incoar la acción que corresponda en derecho* para obtener cualquier otro remedio judicial que estime pertinente.

La sentencia del Tribunal y lo expuesto en la Opinión del Juez Asociado Señor Hernández Denton es lo que jurídicamente procede hacer en este momento. No nos corresponde evaluar el informe financiero en primera instancia. Ello le corresponde por ley a la Oficina de Ética Gubernamental. Tenemos que ser los *primeros* en respetar el ordenamiento jurídico del cual somos guardianes.

— O —

Opinión disidente y concurrente emitida por el Juez Asociado Señor Rebollo López.

No hay duda de que los funcionarios públicos de este País, depositarios y custodios de la confianza y el bienestar de los ciudadanos del mismo, no pueden estar inmunes al escrutinio público como tampoco puede haber dudas sobre el hecho de que la prensa independiente y libre de nuestra Isla tiene derecho al más amplio acceso a información concerniente al descargo de las funciones oficiales de dichos funcionarios.

Uno de los pilares fundamentales de todo país, que pretenda ser catalogado como democrático, lo es una prensa poderosa y vigorosa que mantenga bien informada a la ciudadanía de la conducta y proceder de los funcionarios que dirigen los destinos del Gobierno; ello precisamente con el propósito de que los ciudadanos puedan juzgar la labor y entereza de dichos funcionarios gubernamentales y puedan sustituirlos, y elegir a otros en su lugar, si es que estiman que éstos no son merecedores de la confianza que en ellos depositaron.

Este Tribunal, no hay duda, *tiene la obligación de garantizar esa vigorosidad, ese derecho a información, en fin, esa amplia libertad de prensa.* Ello no obstante, los derechos de la prensa *no* son ilimitados. Los mismos dependen, y se rigen, *necesariamente* por los mandatos y parámetros que emanan de nuestra Constitución y de los estatutos que configuran el ordenamiento jurídico que rige los destinos de este País.

A la luz de los *hechos particulares* del presente caso, *y examinada la legislación aplicable y pertinente a los mismos,* somos del criterio que *no* existe fundamento jurídico válido alguno para sostener que el foro judicial tenga facultad para intervenir con el *claro y preciso* procedimiento que el legislador *diseñó y estableció* para lidiar con esta clase

de situaciones. *Todo lo contrario.* Toda nuestra normativa jurisprudencial nos lleva al resultado opuesto. Esto es, que *ni* este Tribunal —*ni* ningún otro— tiene la facultad o el poder para intervenir con una situación y decisión que, conforme la legislación aplicable, *es claramente un asunto interno de la Asamblea Legislativa en relación con el cual la ley no nos da injerencia.*

*Somos los primeros en aceptar que ello no debería de ser así; esto es, que el foro judicial, en protección de una sana administración pública, debería de tener esa facultad.* La ley, *sin embargo,* es otra. La misma *no* nos confiere competencia en esta materia y sabido es que *no* tenemos facultad para intervenir con la sabiduría o conveniencia de una ley; *esto es, sólo podemos juzgar la validez de la misma.*

En fin, esta es una de esas situaciones en que el Tribunal tiene que *circunscribirse* a señalar la anomalía jurídica, confiando en que las otras dos (2) Ramas del Gobierno actuarán conforme al sentir mayoritario de la ciudadanía, de manera tal que se legisle con el propósito de concederle al foro judicial competencia sobre la materia.

## I

Previo a la aplicación de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, Ley Núm. 12 del 24 de julio de 1985, según enmendada[1] *no existía en nuestra jurisdicción obligación alguna de parte de los funcionarios públicos de este País de rendir informes financieros sobre su actividad económica.*[2] El clamor público a esos efectos desembocó en la aprobación de la citada Ley Núm. 12, la cual —conforme su exposición de motivos— tuvo el propósito de garantizar la confianza del pueblo en su Go-

---

[1] 3 L.P.R.A. sec. 1801 y ss.

[2] Antes de la aprobación de la referida Ley Núm. 12, sólo los candidatos a cargos públicos electivos estaban obligados a radicar en la Comisión Estatal de Elecciones un estado de situación certificado por un contador público autorizado. Véase 3 L.P.R.A. sec. 3151(a).

bierno al, entre otros, penalizar el comportamiento delictivo de aquellos funcionarios que vulneren los principios básicos de la ética en el desempeño de sus labores gubernamentales.

En lo pertinente al caso hoy ante nuestra consideración, la Ley Núm. 12, *supra,* le impone a los funcionarios a los que cobija el *deber ministerial* de someter anualmente informes financieros a la Oficina de Ética Gubernamental, la cual se creó en virtud de ésta. Arts. 4.1(6) y 4.2 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. secs. 1831 y 1832.[3] Una lectura de la citada Ley Núm. 12 es todo lo que se necesita *para uno poder percatarse del hecho curioso de que dicho estatuto establece unas diferencias —respecto al procedimiento y trato que se le brinda— entre los miembros de la Asamblea Legislativa y los demás funcionarios a los que dicho estatuto aplica;* diferencias que convierten a los miembros de dicha Asamblea Legislativa *en parte y árbitro final* de las controversias que puedan surgir respecto a los informes financieros que éstos vienen obligados a radicar.

La referida ley establece, *en términos generales,* que todo empleado o funcionario público, sujeto a la obligación de rendir informes financieros, radicará en la Oficina de Ética Gubernamental, dentro de los primeros sesenta (60) días siguientes a la fecha en que el funcionario o empleado público tome posesión de su cargo, un informe detallado que contenga toda la información requerida por dicha oficina. Este primer informe cubrirá el último año natural y, en sección separada, el tiempo transcurrido del año hasta la fecha en que los compelidos por la ley comenzaron en su cargo o empleo. Art. 4.2 de la citada ley, ante.

Los informes anuales se someterán no más tarde del 1ro

---

[3] En adición a los miembros del poder legislativo, están sujetos a rendir informes financieros el Gobernador, el Contralor de Puerto Rico, el Procurador del Ciudadano, aquellos funcionarios de la Rama Ejecutiva cuyos nombramientos requieran el consejo y consentimiento del Senado o de ambas cámaras, los jefes de agencias y los alcaldes, entre otros. Art. 4.1 de la Ley Núm. 12, ante, 3 L.P.R.A. sec. 1831.

de mayo de cada año subsiguiente a aquel en que se rindió el primer informe. Dicho informe cubrirá el año natural anterior. El Director Ejecutivo de la Oficina de Ética Gubernamental (en adelante Director Ejecutivo) podrá conceder un plazo adicional para radicar los informes financieros, conforme a la reglamentación que adopte a esos fines, pero este período adicional no excederá de sesenta (60) días. Art 4.2 de la Ley Núm. 12, ante.

Los informes financieros requeridos por la Oficina de Ética Gubernamental deberán contener aquella información que el Director Ejecutivo de ésta requiera mediante la reglamentación adoptada a tales efectos.(⁴) De igual forma,

---

(⁴) El Art. 4.4 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1834, dispone:

"La reglamentación que adopte el Director de la Oficina de [É]tica Gubernamental podrá exigir que todo informe financiero incluya la siguiente información para el período cubierto en el informe relativo a la persona que someta el informe y su cónyuge:

"(1) Nombre y dirección oficial y cargo o empleo público ocupado por la persona que somete el informe.

"(2) Nombre o nombres bajo los cuales hacen negocios.

"(3) La ocupación, profesión u oficio.

"(4) Nombre y dirección del principal lugar de negocios o de trabajo.

"(5) Todas las relaciones de empleo o negocio.

"(6) Nombre, dirección y nombre o nombres bajo los cuales hacen negocios otros miembros de su unidad familiar que son funcionarios o empleados públicos, que han realizado negocios con o han prestado servicios al Gobierno de Puerto Rico o sus municipios durante el período cubierto por el informe financiero o que son socios, directores o empleados de negocios o entidades que han realizado negocios o han prestado servicios al Gobierno de Puerto Rico o sus municipios durante ese período.

"(7) Ingresos e intereses en propiedades muebles o inmuebles y en cualquier propiedad en su acepción más amplia.

"(8) Acciones, bonos de empresas privadas, pólizas de seguro y otras participaciones propietarias en empresas o negocios cuyo valor en conjunto exceda de mil (1,000) dólares, incluyendo indicación de cada empresa o negocio envuelto.

"(9) Bonos estatales o municipales cuyo valor en conjunto exceda de mil (1,000) dólares, y toda transacción relacionada durante el período cubierto por el informe.

"(10) Deudas que hayan tenido un balance de más de mil (1,000) dólares en cualquier momento durante el período cubierto por el informe, indicando tipo de interés de cada deuda, e incluyendo toda liquidación de deuda o reducción a mil (1,000) dólares o menos durante el período cubierto por el informe.

"(11) Deudas en relación a las cuales se esté recibiendo cualquier tipo de tratamiento especial o preferencial al compararse con el que reciben otros deudores del mismo acreedor en circunstancias similares por el mismo tipo de deuda.

"(12) Transacciones de compra, venta o permuta de propiedades muebles o inmuebles.

"(13) Arreglos o acuerdos para remuneración futura.

éste determinará el método de divulgación y diseñará el formulario oficial y el apéndice explicativo a ser utilizado por todo aquel que tenga la obligación de someter informes sobre sus finanzas. Art. 4.3 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, ante, 3 L.P.R.A. sec. 1833.

De acuerdo con lo dispuesto en el Art. 4.10 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1840, una vez recibido cada informe de situación financiera, la Oficina de Ética Gubernamental lo examinará y estudiará con miras a determinar si el funcionario ha cumplido con su obligación de someter la información financiera sobre su persona que le ha sido requerida. Si luego de estudiar y analizar el informe financiero, el Director Ejecutivo es de opinión que, *a base de la información que contiene dicho informe*, la persona que somete el mismo ha cumplido con las leyes y reglamentos aplicables, así lo hará constar en el informe y lo firmará.

Por el contrario, si el Director Ejecutivo, basado en la información sometida, entiende que el funcionario *no* está cumpliendo con las leyes y reglamentos aplicables, así lo notificará a dicha persona, indicando específicamente los aspectos que considera que no cumplen con los requisitos establecidos en la ley. En dicha notificación, el Director Ejecutivo le informará a la persona su derecho a presentar su contención por escrito y, de interesarlo, podrá solicitar una vista ante la Oficina de Ética Gubernamental. Posteriormente, el Director Ejecutivo basado en toda la información sometida preparará una determinación preliminar, la

---

"(14) Una relación de todo regalo recibido, excluyendo pago de transportación, comidas, alojamiento y entretenimiento, con indicación del nombre y dirección del donante cuyo valor agregado por donante exceda de doscientos cincuenta (250) dólares por año y que haya sido recibido de personas que no tengan parentesco de por lo menos el cuarto grado de consanguinidad o segundo de afinidad y que no hayan constituido una muestra de hospitalidad estrictamente personal o familiar.

"(15) Toda otra información que, a juicio de la persona que somete el informe o del Director, sea pertinente para la correcta evaluación de su situación financiera en el contexto del interés público que inspira la presente ley."

cual notificará a la persona, proveyéndole tiempo razonable para contestar la misma. Luego de considerar la contestación presentada, si alguna y de ser necesario, modificará el informe y rendirá un informe final el cual será considerado como un documento público. Art. 4.10 del citado estatuto, ante.

## II

En el *caso específico* de los miembros de la Asamblea Legislativa, la obligación de rendir los referidos informes financieros está *expresamente sujeta* a lo dispuesto en el Art. 4.10(d) de la Ley Núm. 12, según enmendado por el Art. 14 de la Ley Núm. 150 de 22 de diciembre de 1994 (3 L.P.R.A. sec. 1840(d)). La citada disposición legal establece que:

> Una vez recibido cada informe de situación financiera de los requeridos por este Capítulo, la Oficina lo examinará y estudiará dentro de sesenta (60) días siguientes a la fecha de radicación con miras a lo siguiente:
>
> .      .      .      .      .      .      .      .
>
> (d) Cuando se trate de informes financieros de los miembros de la Asamblea Legislativa, el Director recibirá y evaluará los informes para constatar que la información esté completa. Una vez verifique que la información está completa, determinará que el informe es final para que se considere como un documento público. El acceso público a dicho informe se regirá por lo dispuesto en el Artículo 4.8 de esta ley y en los Códigos de Etica de la Rama Legislativa o de la Cámara correspondiente. *Cuando a juicio del Director exista la posibilidad de que un funcionario o empleado de la Rama Legislativa haya violado las disposiciones de este Capítulo, el Director remitirá el informe financiero a la Cámara correspondiente para que se tomen las acciones que correspondan.* (Énfasis suplido.) 1994 (Parte 2) Leyes de Puerto Rico 1307, 1318–1319.

El Senado de Puerto Rico —cumpliendo con la antes disposición legal y la *autoimpuesta* obligación de rendir informes financieros, adoptar normas y procedimientos para la presentación de los referidos informes por parte de sus

miembros— *adoptó el Reglamento sobre Radicación de Informes Financieros por los Senadores, Funcionarios y Empleados del Senado de Puerto Rico* (en adelante Reglamento). Dicho reglamento fue promulgado, *inter alia*, en virtud de la autoridad conferida a la Asamblea Legislativa por la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, que autoriza a cada Cámara a adoptar sus reglas de procedimiento y gobierno interno,[5] y el Art. 77 del Código de Ética del Senado de Puerto Rico que reafirma la obligación de Senadores, Funcionarios y Empleados del Senado de rendir informes financieros y la responsabilidad del Senado de aprobar y promulgar un reglamento a tales efectos. En dicho reglamento, el Senado enumeró toda la información que deben contener los informes financieros radicados por los miembros de dicho cuerpo legislativo.[6]

---

[5] *"Sec. 9. [Facultades de cada cámara]*

"Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo. Cada cámara elegirá un presidente de entre sus miembros respectivos."

[6] El Art. 6 del antes citado Reglamento establece:

"Todo informe financiero incluirá la siguiente información para el período cubierto por éste relativo a la persona que someta el mismo y los miembros de su unidad familiar:

"a) Puestos y Cargos.

"Se informará todos los puestos ocupados durante el período cubierto por el informe al igual que todas las posiciones que ocupa al presente como oficial, director, síndico, socio, propietario, representante, empleado o consultor de cualquier corporación, compañía, firma, sociedad, fideicomiso u otra clase de organización agrícola, comercial o industrial, organización de fines no pecuniarios; organización laboral, religiosa, social, fraternal o política; institución educativa u otra institución que no sea el Gobierno de Puerto Rico o de la cual reciba beneficio económico directo o indirecto sustancial.

"Se informará, además, nombre, dirección y nombre o nombres bajo los cuales hacen negocios otros miembros de su unidad familiar que son funcionarios o empleados públicos que han realizado negocios con o han prestado servicio al Gobierno de Puerto Rico o sus municipios durante el período cubierto por el informe finaciero o que son socios, directores o empleados de negocios o entidades que han realizado negocios o han prestado servicios al Gobierno de Puerto Rico o sus municipios durante el período cubierto por el informe.

"b) Activos.

De conformidad con el procedimiento adoptado por el
Senado de Puerto Rico, los informes financieros radicados

"Se informará los activos adquiridos para propósitos personales o como inversión que tengan un justo valor en el mercado en exceso de mil (1,000) dólares; y activos que produzcan ingresos anuales en exceso de quinientos (500) dólares en dividendos, rentas, intereses de cualquier índole, pensiones, participaciones en la distribución de sociedades, empresas comunes u otras empresas comerciales. También informará todas las inversiones en corporaciones cerradas o negocios propios.

"En la determinación del valor de los activos de los Senadores y su unidad familiar se utilizarán los métodos que se indican a continuación:

"1.   Para bienes muebles, un estimado hecho de buena fe si el valor exacto no se conoce;

"2.   Para bienes inmuebles, la tasación realizada por un tasador profesional para la preparación del Estado de Situación Auditado, según lo dispone la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada conocida como "Ley Electoral de Puerto Rico". Para los años intermedios, un estimado de buena fe sobre el incremento del valor producido por cambios ocurridos a las propiedades, ya sea porque las mejoró mediante ampliaciones o modificaciones en la estructura o porque las vías de acceso o circunstancias físicas cercanas al bien han variado. De no haber ocurrido cambio, así lo hará constar. No obstante, si durante los años·intermedios se adquiere un bien inmueble, el mismo deberá ser tasado por un tasador profesional.

"3.   Para acciones no cotizadas en el mercado de valores, el valor en los libros al cierre de operaciones o el valor según la bolsa de valores para aquellas vendidas al público en general;

"4.   En sociedades o comunidad de bienes, el valor neto de su interés en cualquier sociedad u otra propiedad mantenida en común;

"5.   En negocios propios, el valor en los libros al cierre del año;

"6.   En cuentas de ahorros y certificados, el valor en los libros al cierre de año;

"7.   En bonos de ahorro y cualquier otro valor adquirido a través de una casa de corretaje, el valor corriente estimado según notificado por la casa de corretaje.

"Los funcionarios y empleados del Senado podrán utilizar cualesquiera de los métodos de valoración indicados en este Artículo para cualquier bien mueble o inmueble sin que estén obligados a tasar los bienes inmuebles a través de un tasador profesional. El método utilizado para valorar cualquier bien mueble o inmueble, deberá ser utilizado consistentemente a través de los años.

"c)   Pasivos.

"Deberá informar todas las deudas u obligaciones mayores de mil (1,000) dólares, tanto de la persona obligada a radicar un informe financiero como de su unidad familiar.

"La información suministrada incluirá el nombre del acreedor, el monto de la deuda, los términos de pago y la fecha de vencimiento. También será necesario informar todas las deudas en relación a las cuales se esté recibiendo cualquier tipo de tratamiento especial o preferencial al compararse con el que reciben otros deudores del mismo acreedor en circunstancias similares por el mismo tipo de deuda.

"d)   Ingresos.

"Se acompañará una relación de los ingresos, según se define en el Artículo 3(j), de un mismo origen, recibido durante el año anterior o por el período que cubra el informe, incluyendo los de su unidad familiar que excedan de mil (1,000) dólares anuales. En el caso de ingresos recibidos por el cónyuge o cualquier otro miembro de su unidad familiar, deberá informarse en forma global y por concepto. También se deberá incluir una descripción de la participación y el ingreso proveniente de un fideicomiso así como la venta o permuta de propiedades inmuebles o muebles que excedan de mil (1,000) dólares.

por sus miembros en la Oficina de Ética Gubernamental serán recibidos y evaluados por el Director Ejecutivo de dicha Oficina con el propósito de constatar que la información contenida en los mismos está completa. Una vez recibidos y evaluados por el Director Ejecutivo, si a su juicio existe la posibilidad de que se hayan violado las disposiciones de ley referentes a la radicación de los informes financieros, *"éste procederá a remitir copia del informe financiero con sus observaciones a la Comisión de Etica del Senado para la evaluación y acción correspondiente"*. (Énfasis suplido.) Art. 8 del Reglamento.

El Art. 9 del citado reglamento dispone que, si el Director Ejecutivo determina que es necesario someter información *adicional* a la ya presentada, éste notificará al senador, funcionario o empleado que radicó el informe para que, en un período no mayor de treinta (30) días de dicha notificación, someta la información requerida. Esta información adicional formará parte del Informe Financiero. Si el senador, funcionario o empleado concernido no somete la información adicional solicitada dentro del período comprendido, sin mediar justificación alguna, *"el Director de la Oficina de Etica Gubernamental remitirá copia del informe financiero con sus observaciones a la Comisión de Etica del*

---

"e) Arreglos, Acuerdos o Contratos para Remuneración Futura.

"Deberá indicarse en el informe financiero una descripción de cualquier arreglo, acuerdo o contrato para remuneración futura, incluyendo los nombres de las partes, la fecha, los términos y condiciones respecto a:

"1. un empleo futuro;

"2. continuación de pagos recibidos del patrono, corporaciones, sociedad u otra entidad para la cual trabajaba anteriormente;

"3. cualquier participación que todavía se tenga en un plan de retiro de un patrono, corporación, sociedad u otra entidad para la cual trabajaba anteriormente;

"4. becas incluyendo todas las concedidas por instituciones religiosas, educativas o gubernamentales.

"f) Otra Información.

"Toda otra información, que a juicio de la persona que somete el informe sea pertinente para la correcta evaluación de su situación financiera en el contexto del interés público que inspira este Reglamento."

*Senado para su evaluación y acción correspondiente".* (Énfasis suplido.) Art. 9 *in fine.*([7])

El senador, funcionario o empleado del Senado que no cumpla con las disposiciones del Reglamento *estará sujeto a las sanciones dispuestas en el Código de Ética del Senado, en el Reglamento del Senado y en la Constitución del Estado Libre Asociado de Puerto Rico.* (Énfasis suplido.) Art. 14 del Reglamento.

Como puede verse, la obligación que se *autoimpuso* el legislador de rendir informes financieros a la Oficina de Ética Gubernamental, *se rige por disposiciones distintas e independientes a las que reglamentan la obligación de rendir informes de otros funcionarios de gobierno.* Ello es así por *disposición expresa* de la propia ley que les impone el deber de divulgar su información financiera.

### III

Como hemos podido notar, en el *caso específico* de los miembros de la Asamblea Legislativa de Puerto Rico, corresponde a cada Cámara Legislativa —el Senado, en el presente caso— la decisión sobre la *acción final* que deberá tomarse en el caso en que alguno de sus miembros incumpla con su obligación de rendir los informes financieros requeridos por la Ley de Ética Gubernamental; *ello, repetimos, por disposición expresa a esos efectos de la referida Ley Núm. 12.*

Pero, *hay más.* Distinto al caso de otros funcionarios a los que la referida ley cobija,([8]) el Reglamento que para sus

---

([7]) Por el contrario si el Director Ejecutivo de la Oficina de Ética Gubernamental, determina que el informe financiero llena los requisitos establecidos en el Reglamento —no en la Ley de Ética Gubernamental— procederá a firmar y fechar el mismo y lo remitirá al Secretario del Senado. Art. 10 del Reglamento.

([8]) *"Sec. 1852 Revisión judicial*

"Todo funcionario público que resulte afectado por alguna decisión, resolución, orden o acción de la Oficina tendrá derecho a revisión judicial sometiendo la correspondiente petición ante el Tribunal Superior de Puerto Rico, con notificación a la Oficina, dentro de los treinta (30) días de haberle sido notificada la decisión, resolu-

miembros adoptó la Asamblea Legislativa —en el ejercicio de su facultad para adoptar reglas propias para sus procedimientos y gobierno interno— *no provee para la revisión judicial de las determinaciones que, al respecto y en lo pertinente, haga la Comisión de Ética y, en última instancia, la Cámara Legislativa de que se trate.*

Resulta importante, *en relación con este aspecto*, señalar que en el caso de las Cámaras Legislativas *no* aplica la doctrina establecida por este Tribunal a los efectos de que "[e]l silencio de un estatuto sobre el derecho a la revisión judicial de la decisión administrativa no impide la misma. En ausencia de una clara indicación de la intención de la Asamblea Legislativa de limitar el acceso a los tribunales se presume la revisión judicial". *Ortiz v. Alcaide Penitenciaría Estatal*, 131 D.P.R. 849, 859–860 (1992). Ello por la simple y sencilla razón de que las Cámaras Legislativas *no* pueden ser consideradas como "agencias administrativas" a los fines de la aplicación de la antes reseñada doctrina jurisprudencial. Véase 3 L.P.R.A. sec. 2101 y ss.

Somos del criterio que a la controversia que origina el recurso ante nuestra consideración le es de aplicación la doctrina de "cuestión política", la cual como es sabido es una de autolimitación judicial; refiriéndose la misma "a la vez[,] a una de las condiciones para litigar y a un problema de separación de poderes". R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 679. Dicha doctrina "impide la revisión judicial de asuntos cuya resolución corresponda a las otras ramas políticas de gobierno o al electorado". *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497, 509 (1994). Debe recordarse, en adición, que en el caso de epígrafe existe una *delegación expresa* del asunto en controversia a otra rama del Gobierno, *elemento esencial* para la aplica-

---

ción, orden o acción. Las conclusiones de hecho de la Oficina que estén apoyadas por evidencia sustancial a base de la totalidad del récord, serán obligatorias para el tribunal." 3 L.P.R.A. sec. 1852.

ción de la doctrina de cuestión política y, por lo tanto, dicha controversia *no* es una susceptible de adjudicación judicial. *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *Noriega Rodríguez v. Jarabo*, ante.

Aún cuando *no* nos parezca sabio, o *no* nos resulte simpático, el hecho de que el Reglamento sobre Radicación de Informes Financieros, aprobado por el Senado de Puerto Rico, no provea un mecanismo para revisar las determinaciones que al respecto haga su Comisión de Ética y, en última instancia, el Senado en pleno, *no nos corresponde pasar juicio* sobre las reglas de gobierno interno que dicho cuerpo legislativo estimó procedente, *siempre que* dichas reglas estén dentro del ámbito de sus poderes y no violen la Constitución. *Noriega Rodríguez v. Jarabo*, ante. Constituye *norma trillada* la de que no le corresponde a los tribunales juzgar la sabiduría, eficiencia o la justicia de las reglas adoptadas por la Legislatura en ausencia de una infracción constitucional o de que las mismas violenten derechos fundamentales individuales. En ausencia de esa infracción o violación, el asunto cualifica como uno "interno", *exento* de escrutinio por el foro judicial. *Corujo Collazo v. Viera Martínez*, 111 D.P.R. 552 (1981); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

No debe perderse de vista, por otro lado, que el miembro del Senado de Puerto Rico que viole su obligación, legal y reglamentaria, de rendir un informe financiero en forma completa, *no* necesariamente queda impune. Por disposición expresa del Art. 14 del Reglamento que a estos fines aprobó el Senado, dicho senador estará sujeto a las sanciones que entienda procedente imponerle dicho cuerpo legislativo.

## IV

*No* estamos sosteniendo que el peticionario *El Vocero de Puerto Rico* no tenga derecho a obtener copia de los infor-

mes financieros que todos los años los miembros del Senado de Puerto Rico —o de la Cámara de Representantes— vienen en la *obligación* de rendir. De hecho, el propio Reglamento del Senado, en su Art. 11, *así lo establece.*

Lo que sostenemos es que dicho peticionario no tiene derecho a cuestionar ante el foro judicial *la suficiencia* de dicho informe financiero y a compeler a uno de los miembros del Senado a presentar *información adicional* a la que ya ofreció en el informe que ha rendido.

Esa facultad de *evaluar y cuestionar* la suficiencia del informe financiero rendido y de requerir información adicional —conforme *expresamente* establece la Ley de Ética Gubernamental y las disposiciones pertinentes del Reglamento aprobado por el Senado— *le corresponde al Director Ejecutivo.* Por otro lado, y como hemos visto, en caso de diferencias irreconciliables entre el Director Ejecutivo y el integrante del Senado respecto a la suficiencia del informe, el primero reportará el asunto ante *la Comisión de Ética* de dicho cuerpo legislativo, *la cual decidirá el asunto.*

En fin, el *derecho incuestionable* de acceso a información del peticionario *El Vocero de Puerto Rico* en el presente caso *se limita* a obtener copia del informe financiero rendido por el Senador Nicolás Nogueras ante la Oficina de Ética Gubernamental; *no* tiene, sin embargo, facultad *ni* derecho a cuestionar *la suficiencia* de dicho informe.[9]

---

[9] Por último, e independientemente de lo antes expuesto, debe señalarse que, conforme surge de la información provista por las partes en el presente caso, la controversia ante nos carece de "madurez" necesaria para que el foro judicial pueda adjudicar la misma.

Conforme los hechos, el Senador Nogueras ya rindió el informe financiero requerido por el peticionario *El Vocero de Puerto Rico* y este rotativo ya tiene su copia. La Comisión de Ética del Senado, sin embargo, todavía no ha emitido dictamen sobre la suficiencia, o no, del referido informe.

La doctrina de madurez se basa "en consideraciones normativas fundadas en la necesidad de que la controversia esté definida y sea concreta para que el tribunal pueda evaluar en sus méritos las posiciones de las partes en litigio". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 195. *La misma impide que el foro judicial, dados los hechos particulares del presente caso, emita dictamen alguno en el mismo.* Véase *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980).

## V

Unas reflexiones finales. *No* hay duda de que los funcionarios públicos a los que la Ley Núm. 12, ante, aplica vienen en la *obligación* de respetar, y cumplir, la misma. Ahora bien, *no* se puede perder de vista que los integrantes de este Tribunal vienen en la *obligación* de aplicar el referido estatuto de acuerdo a sus *claras* y *expresas* disposiciones; *esto es, a igualmente cumplir y respetar dicha ley.*

En otras palabras, *no* tenemos autoridad constitucional para "interpretar" un estatuto en forma desatinada con el objetivo de imponer nuestros criterios personales. Si así actuáramos, esto es, si hiciéramos caso omiso de las expresas disposiciones de la ley en controversia —las cuales no nos dan injerencia en el asunto— estaríamos *igualmente violando* las disposiciones de la referida Ley de Ética Gubernamental y fomentando un estado de "anarquía judicial". *Ni los criterios personales ni las expresiones rebuscadas y rimbombantes pueden tener el efecto de hacer justiciable un asunto que no lo es.*

Por otro lado, *no* deja de sorprender —por lo errónea— la determinación mayoritaria de que el presente recurso se ha convertido en académico. Como es sabido, en relación con la doctrina sobre academicidad, este Tribunal ha señalado que dicha doctrina requiere que exista una controversia genuina entre las partes, *a través de todas las etapas del procedimiento adversativo.* Véanse: *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958); *Com. de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715 (1980); *El Vocero v. Junta de Planificación,* 121 D.P.R. 115 (1988); *Noriega v. Gobernador,* 122 D.P.R. 650 (1988); *Nogueras v. Hernández Colón,* 127 D.P.R. 638 (1991); *Asoc. de Periodistas v. González,* 127 D.P.R. 704 (1991); *Noriega v. Hernández Colón,* 135 D.P.R. 406 (1994).([10])

---

([10]) La doctrina de academicidad contiene varias excepciones, a saber, "a) aquellas en que se plantea una cuestión recurrente que por su naturaleza hace muy difícil

El hecho de que el Senador Nogueras haya radicado un nuevo informe ante la Comisión de Ética del Senado *no* hace académico el recurso de *mandamus* radicado por *El Vocero*; ello por razón de que la radicación o no de dicho informe financiero *no* es la controversia que plantea *El Vocero* en dicho recurso. En el mismo lo que está en controversia lo es si dicho rotativo tiene, o no, el derecho a cuestionar *la suficiencia* de la información que contiene dicho informe financiero; *controversia que aún está "viva y presente"*. De hecho, así lo plantea y sostiene *El Vocero* al oponerse al señalamiento sobre academicidad.

Ahora bien, lo verdaderamente curioso —y erróneo— lo es el "proceder judicial" de los tres (3) integrantes del Tribunal que, no obstante entender que el recurso se ha convertido en académico, se enfrascan en la exposición, discusión, y supuesta aplicación al caso, de unas "normas" de derecho que, conforme su criterio, rigen y "resuelven" el asunto planteado; esto es, los referidos compañeros Jueces, mediante la ponencia que suscriben y emiten, "ilustran" plenamente a la clase togada sobre qué es en efecto una "opinión consultiva" (*advisory opinion*).

Decía Ortega y Gasset que el hombre es él y sus circunstancias; refiriéndose el notable filósofo, de manera principal, al hecho de que el ser humano actúa conforme las "experiencias" que ha tenido en la vida, las cuales "afectan" su manera de pensar y su forma de proceder. *Sin pretensiones de clase alguna*, añadimos hoy nosotros que el hombre es él, sus circunstancias *y sus limitaciones*. Conocidas son las limitaciones que tenemos todos los integrantes de este Tribunal. *Algunos, naturalmente, son más "limitados" que otros*. Es por ello que resulta perfectamente comprensible —*y hasta perdonable*— el por qué el Juez Asociado Señor

---

dilucidarla nuevamente en los tribunales[;] b) aquellas donde la situación de hechos ha sido cambiada por el demandado pero no tiene visos de permanencia[;] c) aquellas que aparentemente son académicas pero en realidad no lo son por sus consecuencias colaterales, y d) aquellas donde el tribunal ha certificado un pleito de clase y la controversia se tornó académica para un miembro de la clase, mas no para el representante de la misma". (Escolios omitidos.) *Noriega v. Hernández Colón*, 135 D.P.R. 406, 438–439 (1994).

Alonso Alonso *no* logra captar lo erróneo de su posición y proceder y *no* le es posible entender nuestra posición. *No* es la primera ocasión en que ello le sucede y, seguramente, *no* será la última.

Por las razones antes expresadas, y aun cuando *disentimos* del sentir mayoritario a los efectos de que el recurso se ha convertido en académico, *concurrimos* con la Mayoría en que procede dictar Sentencia *desestimando* el recurso de *mandamus* radicado en el presente caso; *ello, sin embargo, por el fundamento de que el asunto planteado en el mismo es uno "no justiciable".*

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

El incumplimiento por un legislador de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, Ley Núm. 12 de 24 de julio de 1985, según enmendada (en adelante Ley de Ética Gubernamental), *jamás es asunto académico.* Y ciertamente no puede ser caracterizado como cuestión política (*political question*), vedada al foro judicial. Por el contrario, es materia claramente justiciable sujeta a la oportuna intervención y revisión de los tribunales. "[L]a justicia [no] reconoce castas ni jerarquías ...." *Moreno v. Gore, Gobernador*, 46 D.P.R. 408, 417 (1934).

I

Nicolás Nogueras (P.N.P.), miembro y Vicepresidente del Senado, al igual que en los dos (2) años anteriores no presentó su informe financiero, esta vez el correspondiente a 1993, en abierta violación a la Ley de Ética Gubernamental y al Reglamento sobre Radicación de Informes Financieros por los Senadores, Funcionarios y Empleados del Se-

nado de Puerto Rico (R. del S. 131 de 6 de marzo de 1993). Debió hacerlo el 2 de mayo de 1994.

El 12 de julio de 1994, el Director Ejecutivo de la Oficina de Ética Gubernamental del Estado Libre Asociado de Puerto Rico (en adelante el Director Ejecutivo), Lcdo. Héctor A. Feliciano Carreras, formuló querella en la Comisión de Ética del Senado contra el Senador Nogueras y los Senadores Oreste Ramos (P.N.P.) y Marco A. Rigau (P.P.D.). Expuso que no habían "radicado sus informes financieros habiéndoseles expirado las prórrogas que solicitaron para dar cumplimiento a su obligación ...". El 20 de septiembre, el Senador Nogueras y su esposa presentaron su escrito *Estado de Condición Financiera al 31 de agosto de 1994*, confeccionado por el C.P.A. Ángel L. Santos Aragón. *No fue jurado ni tiene un desglose de los ingresos y sus fuentes lo cual, de su faz, es insuficiente y constituye una violación crasa a la Ley de Ética Gubernamental y su Reglamento.*

*Transcurrió el tiempo sin que el trámite en la Comisión de Ética del Senado lograra que el Senador Nogueras acatara la ley.* Al cabo de siete (7) meses, el 21 de febrero de 1995, compareció ante nos *El Vocero de Puerto Rico* (en adelante *El Vocero*) en Solicitud de *mandamus*.

El 24 de febrero el demandado Senador Nogueras contestó. Entre sus alegaciones cuestionó nuestra jurisdicción; adujo que no existía ningún deber ministerial y que estaba protegido por la inmunidad legislativa.

A requerimiento nuestro, el 3 de marzo el Director Ejecutivo, licenciado Feliciano Carreras, compareció y expresó que el Senador Nogueras había presentado "tardíamente" su informe financiero el 27 de febrero. A juicio del Director Ejecutivo, ello tornaba el recurso académico. *El Vocero* cuestionó la academicidad fundada en ese solo hecho y nos pidió que concediésemos cinco (5) días al Director Ejecutivo para que lo evaluase e informase si cumplía con la Ley de Ética Gubernamental. El 7 de marzo, dicho funcionario expresó que, *aun cuando no lo había evaluado*, el aludido

informe fue jurado y aparecía "complementado en todas sus partes ...". Moción en relación a réplica parte demandante, pág. 2.

## II

Ni la doctrina de separación de poderes, dimanante de nuestro esquema constitucional, así como estatuto alguno, privan a los tribunales de jurisdicción para hacer cumplir una ley. *En nuestra democracia nadie está sobre el imperio de la ley.* Los preceptos que rigen este caso no tienen *ni pueden tener el efecto de excluir al legislador del escrutinio judicial.*

Como funcionario público, todo legislador está sujeto al crisol del Poder Judicial. La legislación aplicable simple y llanamente visualiza a los tribunales y a las cámaras legislativas como *vasos intercomunicantes* cuyas gestiones sobre el mismo asunto no son mutuamente excluyentes, sino cónsonas con sus respectivos deberes y prerrogativas constitucionales.

En su sustrato, la Ley de Ética Gubernamental diseña igual trámite para todos los funcionarios sujetos a sus disposiciones, *incluso la revisión judicial,* pero reconoce a los legisladores un procedimiento *interno paralelo* que responde a la facultad conferida a la Legislatura mediante el Art. III, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1.([1]) Ese lenguaje constitucional no "margina al Poder Judicial; no se le priva de jurisdicción sobre la materia". *Santa Aponte v. Srio. del Senado,* 105 D.P.R. 750, 759 (1977). A

---

([1]) Dispone:

"Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo. Cada cámara elegirá un presidente de entre sus miembros respectivos." Art. III, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 764.

fin de cuentas, "[n]ingún poder es absoluto en nuestro ordenamiento...". Íd.

*La Ley de Ética Gubernamental alcanza a numerosos funcionarios electos y nombrados (legisladores, secretarios del gabinete, jueces y otros), y pretende prevenir y penalizar conducta antiética que traicione la confianza pública, mediante el principio de que sus ingresos y finanzas están sujetos al escrutinio público. El axioma inmerso que nutre la Ley de Ética Gubernamental es que la "luz solar es el mejor desinfectante".* Sin la oportuna publicidad de los informes financieros, la Ley de Ética Gubernamental sería vana ilusión. "La inmunidad parlamentaria, respetable escudo que protege la irrestricta expresión y voto del legislador en defensa de los altos intereses a él confiados por los electores, está también gobernada por principios de moral y de orden públicos, algunos declarados, como la incompatibilidad entre el cargo de legislador y un empleo en el gobierno; o la prohibición de ocupar en el Gobierno de Puerto Rico un cargo civil creado, o mejorado en su sueldo, durante el término del legislador; y otros no declarados, pero de igual valía y vigencia. Todos son parte de nuestra ordenada libertad y tienen su génesis en el exordio constitucional de que en nuestro país el orden político está subordinado a los derechos del hombre y la 'fe en la justicia' es factor predominante." *In re Rodríguez Torres*, 106 D.P.R. 744, 772 (1978), opinión disidente.

## III

Los funcionarios de las Ramas Ejecutiva, Legislativa y Judicial estamos investidos de amplios poderes y prerrogativas en virtud de una egregia carta orgánica que nos erige gendarmes de una saludable gestión gubernamental. El ser recipientes de tan alta comisión no nos inmuniza del rigor del escrutinio público, incluso la más severa censura, sea de buena o mala fe.

Antes hemos rehusado tejer un manto de secretividad sobre los informes financieros de los miembros de la Judicatura por considerarlo un "privilegio irritante", y que "[l]o oculto genera suspicacia, promueve malos entendidos y frustra las expectativas ciudadanas". *In re Solicitud Periódico El Vocero-Examen Informe Divulgación Financiera Hon. Juez Fernando Campoamor Redín,* res. en 6 de noviembre de 1992, voto disidente.

Como expusimos el pasado 3 de marzo en nuestro *voto disidente* en *Periódico Claridad v. Srio. de Hacienda,* 138 D.P.R. 29, 31 (1995), citando a Elliot E. Slotnick:

" 'Gran parte de lo que muchos adultos aprenden acerca del Gobierno —sus instituciones y miembros, sus actividades, decisiones, defectos, fortalezas y capacidades— dimana de los medios de comunicación masiva. Los mismos medios de comunicación masiva tienen el poder de decidir qué controversias se llevarán a la atención del público, los términos en que serán presentadas, y quién participará, bajo qué condiciones, en la presentación. Debido a las materias que cubren (y no cubren) y las formas en que las estructuran, los medios masivos señalan a los americanos sobre qué pensar, cómo pensar acerca de ello, a veces aún qué pensar.'

Claramente, los medios son algo más que pasivos canales de información. Ellos sirven como filtros y embudos para el universo de eventos que pudieran aparecer ante los ojos del público. Los eventos son interpretados, puestos en contexto, sujetos a especulación y delineados por los medios porque, como apunta Graber, 'los hechos no hablan por sí mismos'. Verdaderamente, 'en un mundo en que la prensa decide qué no informar, se convierte en algo casi tan importante como los eventos mismos en la formulación de la realidad percibida... El anverso es también de aplicación: lo que la prensa considera digno de ser enfatizado se convierte evidentemente en parte importante de 'la realidad'.'

En una visión más amplia, los medios pueden ser un vehículo para la 'normación' (normation) en la sociedad americana, sirviendo como 'modelos de actitudes y comportamiento'. Mientras crean imágenes de las noticias, los medios pueden 'indicar qué visiones y comportamiento son aceptables ... y cuáles son inaceptables o fuera de la corriente mayoritaria (mainstream)'. De forma similar, los medios pueden indicar 'qué se conforma con los parámetros prevalecientes de justicia y moralidad'.

La centralidad del vínculo de los medios entre las instituciones gubernamentales, su formulación de política pública y la politización podría tener mayor vigencia para la Judicatura, que es la rama del gobierno acerca de la cual la mayoría de los americanos están decididamente carentes de información." (Traducción nuestra.) E.E. Slotnick, *Media Coverage of Supreme Court Decision Making: Problems and Prospects*, 75 (Núm. 3) Judicature (Oct.-Nov. 1993).

## IV

Con vista a estos antecedentes, las circunstancias peculiares y la urgencia del recurso, su alto interés público, la legitimación activa de *El Vocero* y su derecho de acceso a información —*Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982)— debimos ordenar la entrega del Informe Financiero presentado por el Senador Nogueras hace escasamente unos días. Esperar el trámite regular administrativo-senatorial sería en esta etapa una gestión tardía y fútil que no ofrece remedio inmediato adecuado a dicho periódico.

Dado el historial de reiterado incumplimiento del Senador Nogueras con la Ley de Ética Gubernamental, *decir que es académico sólo demora su publicación.* Omitir el remedio judicial de la entrega no beneficia al interés público ni a parte alguna. Ciertamente, el demandado Nogueras, al momento de suscitarse la controversia, era uno de los funcionarios de más alto relieve en el Senado, su vice presidente. Es, pues, un error condicionar la publicidad de su informe al resultado del cauce administrativo-senatorial ya que retrasa su examen público en perjuicio de valores comunitarios que deben ser reivindicados con celeridad en abono de la confianza ciudadana en sus legisladores.

Hoy más que nunca, en el complejo entramado de nuestra burocracia gubernamental, es imprescindible reafirmar el derecho de los medios de comunicación masiva al más amplio acceso a las diversas fuentes de información. De

otra forma, nuestra legítima aspiración a una genuina democracia será una mera utopía.

"La característica medular del periodismo moderno es su dinamismo: noticia del momento, actualizada y procesada instantáneamente por medio de la televisión, la radio y, en cierta medida, la prensa diaria escrita." *El Vocero de P.R. v. E.L.A.*, 131 D.P.R. 356, 437 (1992), opinión disidente. Mientras no se haga público dicho informe, continúa infringiéndose abiertamente el derecho constitucional y estatutario de *El Vocero* a lograr un acceso efectivo y *de actualidad. Estamos, pues, ante un círculo vicioso que judicialmente debemos romper.*

En recta lógica y justicia, *El Vocero tiene derecho a examinar ahora, sin más retrasos, la información financiera jurada del Senador Nogueras que debió estar disponible para inspección pública desde hace diez (10) meses si originalmente hubiera cumplido oportuna y cabalmente con su deber ministerial.*